Raymond P. Boucher, State Bar No. 115364
  *ray@boucher.la*
Hermez Moreno, State Bar No. 72009
  *moreno@boucher.la*
**BOUCHER LLP**
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367
Tel:  (818) 340-5400
Fax: (818) 340-5401

Jason K. Feldman, State Bar No. 213386
  *jason@feldmanwallach.com*
Ian Wallach, State Bar No. 237849
  *ian@feldmanwallach.com*
**FELDMAN & WALLACH**
606 Venice Boulevard, Suite C
Venice, California 90291
Tel:  (310) 577-2001
Fax: (310) 564-2004

Mark Ozzello, State Bar No. 116595
  *mozzello@aogllp.com*
**ARIAS OZZELLO & GIGNAC**
6701 Center Drive West, Suite 1400
Los Angeles, California 90045
Tel: (310) 670-1600
Fax: (310) 670-1231

*Attorneys for Plaintiff*
*[listed by name on signature page]*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

CHRISTOPHER PEARLMAN;

            Plaintiff,

      v.

EDMUND G. BROWN, JR.,
individually and in his official capacity
as Governor of California; MATTHEW
CATE, individually as former Secretary
California Department of Corrections
and Rehabilitation; JEFFREY BEARD,
individually and in his official capacity
as Secretary of the California
Department of Corrections and
Rehabilitation (CDCR); JAMES D.
HARTLEY, individually as former
Warden of Avenal State Prison (ASP);
CARL WOFFORD, individually and in
his official capacity as Warden of ASP;
and DOES 1 through 50, inclusive,

            Defendants.

Case No.

**COMPLAINT FOR DAMAGES**

**1.  VIOLATION OF 42 U.S.C. § 1983
     [VIOLATION OF THE EIGHTH
     AMENDMENT];**

**DEMAND FOR JURY TRIAL**

Plaintiff CHRISTOPHER PEARLMAN; an individual (hereinafter "Plaintiff"), by and through his undersigned counsel, brings this action against Defendants EDMUND G. BROWN, JR., individually and in his official capacity as Governor of California; MATTHEW CATE, individually as former Secretary California Department of Corrections and Rehabilitation; JEFFREY BEARD, individually and in his official capacity as Secretary of the California Department of Corrections and Rehabilitation ("CDCR"); JAMES D. HARTLEY, individually as former Warden of Avenal State Prison ("ASP"); CARL WOFFORD, individually and in his official capacity as Warden of ASP; and DOES 1 through 50, inclusive, (hereinafter collectively "Defendants"). All allegations in this Complaint are based upon information and belief except for those allegations which pertain to Plaintiff and his counsel. Plaintiff's information and belief are based upon, *inter alia*, the investigation conducted to date by Plaintiff and his counsel. Each allegation in this Complaint has evidentiary support or is likely to have evidentiary support upon further investigation and discovery.

## I.

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.   Infliction of Valley Fever, a debilitating and potentially fatal disease, constitutes Cruel and Unusual Punishment, in violation of the Eighth Amendment to the United States Constitution, as it deprives Plaintiff of a federally-guaranteed right under color of state law in contravention of 42 U.S.C. § 1983.

2.     Venue is proper in the Court, pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to the claims occurred within the Eastern District of California, specifically Kern County.

3.     Pursuant to Local Rule 120(d), this case is appropriately commenced in the United States District Court sitting in Fresno, California, because a substantial portion of the conduct and actions giving rise to the claims made in this case occurred in Kern

1 | County.

2 |     4.      Plaintiff seeks monetary damages, declaratory and injunctive relief under

3 | 28 U.S.C. §§ 1343, 2201, and, 2202, 29 U.S.C. § 794a, and 42 U.S.C. §§ 1981, 1983,

4 | 2101, *et seq.*

5 | **II.**

6 | **PARTIES**

7 | **PLAINTIFF**

8 |     5.      Plaintiff CHRISTOPHER PEARLMAN (hereinafter "Plaintiff") is a forty-

9 | eight year-old Japanese and Caucasian male.

10 |     6.      On or about 2003, Plaintiff was committed to the custody of the California

11 | Department of Corrections and Rehabilitation (hereinafter "CDCR").

12 |     7.      On or about June 2011, Plaintiff was transferred to Avenal State Prison

13 | (hereinafter "ASP").

14 |     8.      At the time of his arrival at ASP, Plaintiff was free of the cocci disease and

15 | in generally good health.

16 |     9.      On or about June 2012, Plaintiff experienced symptoms of Valley Fever,

17 | which persisted until he was evaluated in October 2013, and was found to have a titer

18 | score of 1:32.

19 |     10.    On or about March 2012, Plaintiff was informed that he had Valley Fever.

20 | He was subsequently diagnosed with cocci meningitis.

21 |     11.    Plaintiff experienced significant weight loss, lethargy, dizziness, cold

22 | sweats, headaches, double vision, nausea, had lumbar punctures completed, and severe

23 | emotional distress and depression.  Plaintiff continues to suffer from this life-long

24 | disease.

25 |     12.    Plaintiff was paroled on June 15, 2013.

26 |     13.    Plaintiff brings this Complaint for money damages for personal injuries

27 | suffered as a result of the negligent and wrongful acts and omissions of the Defendants.

### DEFENDANTS

14. Defendant EDMUND G. BROWN, JR. (hereinafter "Governor Brown") is, and at all times herein mentioned was, the Governor of the State of California.

15. As the Governor of California and the Chief Executive of the state government since January 3, 2011, Governor Brown supervises and oversees the official conduct of all executive and ministerial officers.

16. At all times relevant, Governor Brown has retained the ultimate state authority over the care and treatment of inmates in California prisons, including Plaintiff.

17. Governor Brown personally acted to deprive Plaintiff of his rights and failed to act to protect Plaintiff from the constitutional injuries detailed herein.

18. Plaintiff brings this action against Governor Brown in his individual and official capacities.

19. Defendant MATTHEW CATE ("Cate") was the Secretary of the CDCR from 2008-2012.

20. During that period of time, Cate was responsible for the operation of the California State prisons, for the health and welfare of Plaintiff, and the prison population as a whole, and had direct authority over every CDCR employee.

21. At all times relevant, Cate oversaw the management and operation of all California State prisons, including decisions concerning staff deployment and training that directly affects the ability of inmates, such as Plaintiff, to obtain adequate medical care.

22. Cate was also responsible for the policies and practices of the organization.

23. In setting and maintaining those policies and practices, Cate personally acted to deprive Plaintiff of his rights and failed to act to protect Plaintiff from the constitutional injuries detailed herein.

24. At all times relevant, Cate knew, or in the exercise of reasonable care,

1   should have known, that the presence of coccidioidomycosis in and around CDCR

2   prison facilities in the San Joaquin Valley of California posed a substantial risk of

3   serious harm to inmates, including Plaintiff.

4       25.     Cate personally acted to deprive Plaintiff of his rights and failed to act to

5   protect Plaintiff from the constitutional injuries detailed herein.

6       26.     Plaintiff brings this action against Cate individually.

7       27.     Defendant JEFFREY BEARD ("Beard"), as the current Secretary of the

8   CDCR since December 27, 2012, oversees the management and operation of all prison

9   facilities, including decisions concerning staff deployment and training that directly

10  affect Plaintiff's ability to obtain adequate medical care.

11      28.     As Secretary of the correctional system, Beard is responsible for the

12  policies and practices of the organization.

13      29.     In setting and maintaining those policies and practices, Beard personally

14  acted to deprive Plaintiff of his rights and failed to act to protect Plaintiff from the

15  constitutional injuries detailed herein.

16      30.     Plaintiff brings this action against Beard in his individual and official

17  capacities.

18      31.     At all times relevant, Defendant JAMES D. HARTLEY ("Hartley") was

19  the former Warden of ASP from 2007 through part of 2013.

20      32.     As Warden, Hartley was responsible for the policies and practices of the

21  prison as well as for its operational decisions, and had direct authority over every

22  employee at ASP.

23      33.     At all times relevant, Defendant Hartley was responsible for the operation

24  of ASP and for the health and welfare of its inmates, including Plaintiff.

25      34.     At all times relevant, Defendant Hartley knew or, in the exercise of

26  reasonable care, should have known that the presence of coccidioidomycosis in and

27  around ASP posed a substantial risk of serious harm to ASP inmates, including

1  Plaintiff.

2       35.    Defendant Hartley personally participated in the decisions not to install

3  ground cover and implement other remedial measures that would have protected

4  inmates.

5       36.    Defendant Hartley personally participated in the failure to protect inmates

6  from increased risk of Valley Fever, was deliberately indifferent to inmates' risk of

7  contracting Valley Fever, and is personally responsible for the injuries sustained by

8  inmates who contracted Valley Fever at Avenal State Prison from 2007 onward,

9  including Plaintiff as specified below.

10       37.    Plaintiff brings this action against Hartley individually.

11       38.    At all times relevant, Defendant CARL WOFFORD ("Wofford") is and

12  since 2013, has been the Warden of ASP.

13       39.    At all times relevant, Defendant Wofford was responsible for the operation

14  of ASP and for the health and welfare of its inmates, including Plaintiff.

15       40.    At all times relevant, Defendant Wofford knew or, in the exercise of

16  reasonable care, should have known that the presence of coccidioidomycosis in and

17  around ASP posed a substantial risk of serious harm to ASP inmates, including

18  Plaintiff.

19       41.    Defendant Wofford failed to implement recommended remedial measures

20  at ASP.

21       42.    Defendant Wofford personally acted to deprive Plaintiff of his rights and

22  failed to act to protect Plaintiff from the constitutional injuries detailed herein.

23       43.    Plaintiff brings this action against Wofford individually and in his official

24  capacity.

25       44.    The true names and capacities, whether individual, corporate, partnership,

26  associate or otherwise of Defendants DOES 1 through 50, inclusive, are presently

27  unknown to Plaintiff at this time, who, therefore, sues these Defendants by such

fictitious names.

45.     Each of these Defendants DOES 1 through 50 were aware of the increased risk to Plaintiff and had the authority, ability and means to reduce those risks but failed to do so.

46.     Plaintiff will seek leave to amend this COMPLAINT to allege the true names and capacities of DOES 1 through 50, inclusive, if and when the same are ascertained.

47.     Plaintiff is informed and believes, and based upon that information and belief alleges, that each of the Defendants named in this COMPLAINT are responsible in some manner for one or more of the events and happenings that proximately caused the injuries and damages hereinafter alleged.

48.     Plaintiff is informed and believes, and based upon that information and belief alleges, that each of the Defendants named in this COMPLAINT knowingly and willfully acted in concert, conspired and agreed together among themselves, and entered into a combination and systemized campaign of activity to, *inter alia*, damage Plaintiff and to otherwise consciously and/or recklessly act in derogation of Plaintiff's rights, and the trust reposed by Plaintiff in each of these Defendants.  Defendants' concerted actions were such that, to Plaintiff's information and belief, and to all appearances, Defendants represented a unified body so that the actions of one Defendant were accomplished in concert with, and with knowledge, ratification, authorization and approval of each of the other Defendants.

49.     Plaintiff is informed and believes, and based upon that information and belief alleges, that each of the Defendants named in this COMPLAINT is, and at all times mentioned herein was, the agent, servant and/or employee of each of the other Defendants and that each Defendant was acting within the course of scope of his, her, or its authority as the agent, servant, and/or employee of each of the other Defendants. Consequently, all of the Defendants are jointly and severally liable to Plaintiff for the

1   damages sustained as a proximate result of their conduct.

## III.

## FACTUAL ALLEGATIONS

### BACKGROUND OF COCCIDIOIDOMYCOSIS INFECTION

50.    Coccidioidomycosis (commonly known as "Valley Fever" or "San Joaquin Valley Fever" or simply as "cocci") has long been known as a serious infectious disease, which is contracted by the inhalation of an airborne fungus, *Coccidioides Immitis*.  Once inhaled and lodged in various locations in the respiratory system, the spores grow and transform into large tissue-invasive parasitic spherules.   These spherules then divide, enlarge, and rupture, thus, releasing as many as thousands of new "endospores" that can invade surrounding tissue or migrate through the blood to other tissues and organs, where they can repeat the process and continue to invade other locations in the body.

51.    Cocci is endemic in the soil of various areas of the Southwest. Nowhere is it more prevalent, however, than in the San Joaquin Valley of California, where ASP is located.

52.    Although about sixty percent of those with Valley Fever are asymptomatic, others develop severe flu-like symptoms that typically last for weeks or months.

53.    Individuals with certain characteristics are at particularly high risk for developing the "Disseminated" form of Valley Fever that afflicts the plaintiff, which otherwise affects approximately ten percent of the infected population.

54.    Disseminated Cocci is a serious infection indicated by a "titer score" of 1:16 or stronger and commonly affects soft tissues, bones, joints, and the membranes surrounding the brain and spinal cord.   A "titer score" is the most common measurement of the degree of a cocci infection.

55.    It is well known that disseminated Coccidioidomycosis is progressive,

1  painful, and debilitating, and that, if left untreated, it is uniformly fatal once it
2  progresses to meningitis.

3       56.    Once contracted, there is no iatrogenic cure for the disease.  Surgical
4  excision of tissue and bone is the only medical response for some extrapulmonary
5  infections of Coccidioidomycosis.  Certain triazole compounds, including Fluconazole
6  (400 mg/day), have been found to be effective in treating most presentations of
7  Coccidioidomycosis, but the drug must be taken daily, and lifelong treatment with
8  Fluconazole is recommended.   Fluconazole is expensive, but failure to take it
9  religiously is even more expensive.  Of those patients who stop taking the drugs,
10  approximately 75% will relapse into the life-threatening disease within one year.

### STATE OFFICIALS, INCLUDING DEFENDANTS, HAVE BEEN AWARE OF THE INCREASED RISK OF VALLEY FEVER AT ASP

13       57.    California health officials have known about the prevalence of Valley
14  Fever in the San Joaquin Valley and the disease's acute risks to inmate health for over
15  fifty (50) years.  *See* Smith, C. E.: The Epidemiology of Acute Coccidioidomycosis
16  With Erythema Nodosum ("San Joaquin" or "Valley Fever"), American Journal of
17  Public Health 30, at p. 600

18       58.    In June of 1994, the United States Centers for Disease Control and
19  Prevention (hereinafter the "CDC"), in its publication called the *Morbidity and*
20  *Mortality Weekly Report* (MMWR), issued an article prepared by a group of physicians
21  and  scientists  preeminent  in  the  field  of  infectious  disease,  entitled
22  "Coccidioidomycosis - California, 1991-1993," reporting on the devastating impact of
23  Valley Fever in California, as well as the fact that in the years 1991 through 1993, 70%
24  of the reported cases of coccidioidomycosis in California arose in the San Joaquin
25  Valley.  *See* http://www.cdc.gov/mnwr/preview/mmwrhtml/00031453.htm.

26       59.    Two years later, in 1996, The National Foundation for Infectious Diseases
27  held the Fifth International Conference on Coccidiodomycosis, and published a

1  summary of the articles discussed at that conference. Included was the "California

2  Health Services Policy Statement on Coccidiodomycosis", which stated that – from

3  1991 to 1993, California was spending $60 million dollars on health care costs from

4  Coccidiodomycosis infections. It noted and recognized that individuals, such as

5  Plaintiff, were at a higher risk for acquiring Disseminated Coccidioidomycosis. The

6  report identified the area that houses ASP as the most endemic for the cocci spores and

7  the most likely place to generate cocci infections.  It identified, as preventative

8  measures, the use of spherulin skin tests to identify those not vulnerable to

9  Disseminated Cocci, the use of dust-control measures, masks, and the wetting of the

10  soil.

11        60.    In September of 1996, Doctors Thea N. Kirkland and Joshua Fierer, both

12  of the University of California-San Diego, School of Medicine, published an article in

13  *Emerging Infectious Diseases* (another publication of the CDC), entitled

14  "Coccidioidomycosis: A Reemerging Infectious Disease." In this article, Kirkland and

15  Fierer comment on the Valley Fever epidemic of 1991-1993 reported above, and state,

16  ". . . the San Joaquin Valley, California, is one of the most highly coccidioidomycosis-

17  endemic regions." *See* http://www.cdc.gov/ ncidod/eid/vo12no3/kirkland.htm.

18        61.    Despite this information, the CDCR built eight prisons within the hyper-

19  endemic regions of San Joaquin Valley: Avenal State Prison; California Correctional

20  Institution; California State Prison-Corcoran; Wasco State Prison; North Kern State

21  Prison; Pleasant Valley State Prison; California Substance Abuse Treatment Facility

22  and State Prison, both at Corcoran; and Kern Valley State Prison.

23        62.    For more than twenty years, the health and welfare of California's inmate

24  population has been drastically impacted by CDCR's deliberate decisions of locating

25  these prisons in the hyper-endemic region of the Central Valley, significantly

26  overcrowding them, housing certain inmates at risk or at increased risk from Valley

27  Fever, and failing to implement any of the remedial measures recommended to reduce

**10**

1   inmate exposure to cocci.

2       63.     In November 2004, Renee Kanan, M.D., Deputy Director of Health Care

3   Services at CDCR, wrote a memorandum to all health care managers, staff members,

4   and other officials within CDCR regarding Valley Fever and its origin in soil fungus.

5   *See* Kanan, Renee, M.D., "Valley Fever," Dept of Corrections Memorandum to Health

6   Care Managers, dated November 5, 2004 (hereinafter "Kanan" or "Kanan Memo").

7       64.     The memorandum included a three-page overview of Valley Fever, its

8   cause, diagnosis, symptoms, and treatment. The memorandum expressly admitted that:

9   (a) prisons in Kern, Kings, and San Luis Obispo counties, which includes Avenal State

10  Prison, California State Prison – Corcoran, Kern Valley State Prison, and Wasco State

11  Prison, are located within areas which host the dangerous cocci fungus in the soil; (b)

12  Valley Fever has "potential lethality" for people exposed to the fungus, making it

13  necessary for clinical staff at all CDCR institutions to maintain a high level of suspicion

14  for the disease; (c) "winds and construction activity may cause the organism to be

15  blown into the air where it can be inhaled, and pneumonia can occur"; (d) "[a]

16  percentage of individuals exposed to coccidioides immitis . . . will progress to . . .

17  pneumonia (the incubation period is up to four (4) weeks), or to disseminated disease;

18  (e) "if dissemination occurs, it usually does so within the first six months following

19  pneumonia"; (f) "[t]he risk and incidence of disseminated disease are highest in

20  American Indians, Asians, Blacks and immuno-compromised individuals"; (g)

21  "[d]issemination usually occurs to the skin, bones and meninges, although any part of

22  the body can be involved"; (h) "dissemination occurs in 1 of every 300 patents with

23  pneumonia" but "[i]n Hispanics and blacks, it is 1 in 40"; (i) "a bone scan should be

24  obtained on all patients with known or suspected disseminated disease"; (j) bone

25  lesions, back pain and paraplegia may result from Valley Fever, and are often

26  asymptomatic; (k) "[a]symptomatic bone lesions can often be treated with observation;

27  however, the spine is a particularly common site of involvement and is often

accompanied by the gradual onset of back pain"; (l) "if spinal bone pain or abnormal X-rays are ignored, collapse of the spine with trauma to the cord and paraplegia may result"; (m) "[w]ith spine lesions, surgery is usually required to drain abscesses and stabilize the spine"; and (n) skin lesions "imply a poor prognosis and often herald widespread dissemination." *Id*.

65. The Kanan Memo was and continues to be widely available to state officials, including the Defendants, after it was initially distributed to CDCR officials.

66. An August 3, 2006, internal memorandum from the director of Adult Institutions at the CDCR further confirmed that CDCR officials knew that they were exposing inmates to an elevated risk of Valley Fever. *See* Dovey & Farber-Szekrenyi, *"Inmate Patients at High Risk of Valley Fever Excluded from Specific Central Valley Institutions"*, CDCR Memorandum, dated August 3, 2006.

67. An internal CDCR memorandum, dated October 27, 2006, to all administrative personnel, ostensibly generated at the request of Sacramento government officials, described the epidemic infection rates:

    2001 – 42 inmates
    2002 – 38 inmates
    2003 – 80 inmates
    2004 – 66 inmates      1 death
    2005 – 187 inmates     5 deaths
    2006 – 1145 inmates  8 deaths

The Cocci information set forth above was "an approximation of the number of inmates with positive Cocci lab results." *See* Durst, Karen, *"Coccidioidomycosis (Cocci) Report"*, CDCR Memorandum, dated October 27, 2006.

68. Defendants, and each of them, were also apprised of the ongoing Valley Fever epidemic through a November 20, 2007, CDCR memorandum to institution staff, including wardens of eight prisons located in the hyperendemic area, including ASP,

CSP, KVSP, PVSP, and Wasco, identifying a significant increase in the number of Valley Fever cases, "with deaths attributed to this disease," among inmates in the San Joaquin Valley in "calendar year 2005."

69.     In that same memo, CDCR recognized a mitigation approach that would transfer out of facilities like ASP, inmates who meet the "cocci susceptibility exclusion criteria." As described in the memorandum, officials were urged to "[c]onsider planting ground cover or grass on open direct areas within prison grounds" and "[w]hen digging, use protective mask and wet the ground prior to digging."

70.     In April 2012, the California Correctional Health Care Services (hereinafter "CCHCS") released a report titled, "Coccidioidomycosis in California's Adult Prisons, 2006-2010", which concluded that incidence of coccidioidomycosis has been increasing in some prisons, with rates as high as 7% during 2006–2010.  *See* Coccidioidomycosis in California's Adult Prisons 2006–2010. California Correctional Health Care Services Public Health Unit and Quality Management; 2012.  As a result, the annual cost of coccidioidomycosis care and treatment in California prisons was estimated to exceed $23 million.  *Id*.  The report noted that "the incarceration of individuals . . . in prisons within the endemic areas will continue to provide a stream of challenging and costly cases of coccidioidomycosis."  *Id*.

71.     Though all of the prisons in the endemic areas presented a potentially elevated risk of exposing inmates to Valley Fever, there are two – ASP and PVSP – at which these risks are acutely amplified.

72.     During 2006-2010, the rate at ASP was significantly higher than rates in the county in which it is located.  In comparison with the rate in California (7/100,000), the rate at ASP was 189 times higher (1326/100,000).

73.     The study also revealed that ASP had a cocci rate that was nearly ten times higher, than the county with the highest rate in California.

74.     The CCHCS Report also found that CDCR had done nothing between

13
COMPLAINT FOR DAMAGES

2006 and 2010 that had any effect on cocci incidence rates at prison institutions in the San Joaquin Valley. This failure to act continued for years and exhibits deliberate indifference by state officials.

75. The report received general circulation among CDCR staff, including specifically wardens, unit managers and executives.

76. Approximately 36 inmates detained at prisons within the San Joaquin Valley have died between 2006 and 2011 as a result of exposure to cocci.

### DEFENDANTS KNEW OF THE RISK TO PLAINTIFF AND FAILED TO TAKE ANY MEASURES TO PROTECT PLAINTIFF

77. Preventative measures that can effectively combat the spread of cocci have been documented in medical literature since the 1940s. *See, e.g.*, Smith, C. E.: *The Epidemiology of Acute Coccidioidomycosis With Erythema Nodosum ("San Joaquin" or "Valley Fever")*, American Journal of Public Health 30, at 600 (June 1940).

78. Beginning in 2006, numerous experts from various organizations including the CDCR itself recommended, in addition to screening out at-risk inmates and transferring them away, designing and implementing simple, specific remedial measures at the hyper-endemic prisons in order to reduce inmates' exposure to the cocci-containing soil there. Besides the CDCR experts, the CCHCS, the California Department of Public Health ("CDPH"), and independent public health experts all recommended simple, specific remedial measures. These included landscaping, paving, soil stabilization, limiting and strictly controlling excavation and soil-disturbing activities at the prisons, limiting inmate exposure outdoors during windy conditions, and providing respiratory protection for inmates who worked outdoors or went outdoors under adverse conditions.

79. In the November 20, 2007 memo, the CDCR recognized a mitigation approach that would transfer out of facilities like ASP, inmates who meet the "cocci susceptibility exclusion criteria." As described in the memorandum, officials were

urged to "[c]onsider planting ground cover or grass on open direct areas within prison grounds" and "[w]hen digging, use protective mask and wet the ground prior to digging."

80.     In 2008, Executive Order S-06-08 was issued by then-Governor Arnold Schwarzenegger, which declared a statewide drought and "strongly encouraged" local water agencies and districts to take aggressive, immediate action to reduce water consumption.  The CDCR agents and representatives interpreted Executive Order S-06-08 as a directive to stop maintaining such grass cover, thereby substantially increasing the risk that inmates at ASP would contract Valley Fever.   Upon taking office, Governor Brown, despite explicit knowledge that grass cover is a mitigation technique that minimizes the spread of spores, took no actions to mandate that the CDCR stop relying on this Order as a justification for ceasing the only remedial measure in place to reduce cocci infections at ASP.

81.     Each Defendant was aware that housing inmates at the hyper-endemic prisons posed a greatly elevated risk to those inmates of contracting Valley Fever and that failure to control exposure to the cocci-containing soil at those locations (such as by construction activity) increased that risk significantly.

82.     Defendants' response to this disease has been totally inept and in clear violation of Plaintiff's constitutional rights. Not only did Defendants place Plaintiff in harm's way, they then failed to implement even rudimentary measures recommended by the correctional authority's own medical experts to protect inmates, such as Plaintiff, from disease.

### DEFENDANTS FAILED TO DISCLOSE TO PLAINTIFF THE KNOWN RISKS

83.     Each Defendant responsible for CDCR-wide or facility-level inmate operations had the ability to disclose to Plaintiff essential facts regarding the risks from Valley Fever, the increased risk that the Plaintiff faced, and the fact that those increased risks, and Plaintiff's resulting injuries, were caused by Defendants' actions, but instead

1    purposely failed to disclose those facts.

2          84.    Defendants failed to disclose to Plaintiff the risk factors for the disease, the

3    likelihood of exposure, the common symptoms and progress of the disease, the

4    seriousness of the injuries it causes, the dangerous local conditions that increased

5    Plaintiff's likelihood of contracting the disease, and the fact that Defendants themselves

6    were responsible for the increased risk that Plaintiff faced.

7          85.    Because these Defendants affirmatively failed to disclose these facts from

8    Plaintiff, Plaintiff was not fully aware of the increased risks he faced at ASP, that

9    Plaintiff was particularly susceptible to those risks, or that Defendants' wrongful

10   conduct had caused him to be exposed to those increased risks.

11         86.    Plaintiff relied on Defendants to provide such information and to

12   adequately educate Plaintiff about those risks and the nature of Plaintiff's injuries, and

13   Defendants intended that Plaintiff should so rely.

14         87.    Had Defendants advised Plaintiff of the cocci-related risks at ASP,

15   Plaintiff could have submitted a transfer request which, if granted, would have

16   protected Plaintiff from acquiring the disease he has today.

17   **DEFENDANTS DO NOT PROVIDE TO PLAINTIFF ANY POST-RELEASE MEDICAL**
     **CARE OR FINANACIAL ASSISTANCE FOR MEDICAL CARE, DESPITE CAUSING**
18   **PLAINTIFF TO CONTRACT A SERIOUS AND LIFE-LONG DISEASE WHILE**
     **INCARCERATED**
19

20         88.    Contraction of cocci, to a medical certainty, can and has caused Plaintiff a

21   variety of illnesses and symptoms. Coccidioidomycosis is an extremely serious and

22   potentially debilitating condition which requires, to a reliable medical certainty, the

23   need for constant medical monitoring and treatment, including, but not limited to,

24   medical examinations, prescriptions for medication and appropriate and timely medical

25   treatment for flare-ups.

26         89.    Such medical care is available for inmates during their period of

27   incarceration, but no such medical treatment is available to them once released.

90.     Once inmates, including Plaintiff, are infected with Valley Fever, no compensation is provided for this additional punishment that has been unfairly added to their sentences. Once released from custody, Defendants do not provide health care or financial assistance to assist Plaintiff with the overwhelming cost and hazards associated with Valley Fever.   Defendants simply absolve themselves of all responsibility, leaving Plaintiff, who will have spent years incarcerated and away from society, to fend for himself and obtain healthcare for an illness that – if left untreated – is uniformly fatal.

91.     Defendants provide no means for post-release health care or financial assistance for those who contracted Disseminated Valley Fever while incarcerated and under the supervision and care of the State of California.  As a result, many individuals, including Plaintiff, are either unable to properly monitor their Valley Fever after their release from custody or are forced to spend a great deal of money to do so.

92.     Treatment for Disseminated Valley Fever can cost anywhere from hundreds to in excess of several thousand dollars per month (Amphotericin B, the most commonly used intravenous drug for Valley Fever, costs at least $3,000 per month), and these treatments can have ravaging side effects. *See* http://www.reportingonhealth.org/valleyfever/just-one-breath-valley-fever-treatments-can-do-harm-they-heal.

93.     While the cost to California and U.S. taxpayers for treating individuals who have become infected with Disseminated Valley Fever while incarcerated, and who are later released is not yet known, the cost of outside hospital care for incarcerated individuals with Disseminated Valley Fever is approximately $23,000,000 per year. *See* http://www.reportingonhealth.org/valleyfever/taxpayers-spend-millions-valley-fever-prisons. It is expected that California and U.S. Taxpayers are presently spending in excess of this amount to pay for health care necessitated by exposing hyper-susceptible individuals, such as Plaintiff, to a hyper-endemic environment,

1    resulting in the acquisition of Disseminated Valley Fever.

2    94.    There is an important public health interest in fostering access to medical

3    care for persons who have contracted disseminated cocci while in custody at hyper-

4    endemic prisons.  Early treatment of symptoms during a flare-up can aid in treatment

5    and minimize the pain and disability suffered.

6    95.    Plaintiff – as a result of CDCR's failure to implement the measures

7    advised by the Federal Receiver – seeks future health care and health care costs

8    resulting from CDCR's failure to implement those remedial measures, and

9    compensatory damages.

10    **FIRST CAUSE OF ACTION**

11    **FOR VIOLATION OF 42 U.S.C. § 1983**

12    **[Violation of Plaintiff's Eighth Amendment Rights]**

13    *(As against all Defendants on behalf of Plaintiff)*

14    96.    Plaintiff re-alleges and incorporates by reference, as though fully set forth

15    herein, all of the preceding paragraphs.

16    97.    The Plaintiff has a federally protected Eighth Amendment right to be free

17    from cruel and unusual punishment, a right secured by the United States Constitution

18    pursuant to 42 U.S.C. § 1983.

19    98.    Defendants acted under color of state law in that Defendants are state

20    employees, operate the state prisons, and carry out the policies and practices described

21    herein under the authority of California statute, regulation, and policy, to control

22    Plaintiff's lives, prison housing location and prison housing conditions.

23    99.    The Eighth Amendment prohibits inhumane methods of punishment and

24    inhumane conditions of confinement.

25    100.   When the State takes a person into its custody and holds him against his

26    will, the Constitution imposes upon it a corresponding duty to assume a responsibility

27    for his safety and general well-being.  When the State fails to provide for the needs of a

confined individual, including appropriate medical attention and reasonable safety, it transgresses the substantive limits on state action set by the Eighth Amendment.

101.   An Eighth Amendment violation is stated when officials can be shown to have known of and disregarded a substantial risk of serious harm to prisoners.

102.   It is cruel and unusual punishment under the Eighth Amendment to expose inmates to adverse environmental toxins that cause serious harm.

103.   Each Defendant had a duty to ensure that all possible steps were taken to protect high-risk inmates, including Plaintiff, from the objectively and sufficiently serious risk as described herein.

104.   Each Defendant knew that Plaintiff was housed at a hyper-endemic prison, and therefore, faced an increased risk of serious harm from infection by the coccidoides spores known to be present at elevated levels.

105.   Each Defendant knew that Plaintiff was among the class of people exceptionally susceptible to an outbreak of cocci while incarcerated in the San Joaquin Valley.

106.   Defendants have engaged in a pattern and practice of conduct which they knew would place and keep California prison inmates, including Plaintiff, incarcerated at locations of unreasonable risk of personal injury.

107.   At all relevant times, and despite the ability and authority to do so, Defendants, and each of them, did not employ any screening process to divert higher-risk individuals, including Plaintiff, from assignment to prison facilities in the San Joaquin Valley. Rather, Defendants categorically refused to exclude highly at-risk individuals, such as Plaintiff, from incarceration in these infected facilities.

108.   The Defendants' failure to adopt an exclusion policy, which would have prevented Plaintiff's exposure to coccidoides spores, and each Defendant's actions or inactions regarding remedial measures to ensure safe conditions caused Plaintiff's injuries.

109. Each Defendant's failure to implement protective remedial measures throughout their tenure allowed the dangerous conditions at the prison to continue unabated and proximately and substantially caused Plaintiff to be exposed to a significantly greater risk of exposure at all times subsequent.

110. Despite numerous, repeated and explicit warnings about the serious danger of Valley Fever to inmates at the hyper-endemic prisons, and most especially to those identified as high-risk persons with enhanced susceptibility for disseminated cocci disease, Defendants failed to take the reasonable, obvious steps needed to protect those involuntarily in their charge.

111. Defendants knowingly and recklessly promulgated or continued a practice and policy of failing to employ mitigation measures at ASP, such as paving, landscaping or planting grass to minimize the spread of the spores, or implementing appropriate measures with respect to ventilation systems to prevent spores from entering the interior of the facility.

112. Defendants knowingly and recklessly promulgated or continued the practice and policy of failing to warn inmates about the dangers of prisons to which they were involuntarily and forcibly transferred.

113. Had each Defendant implemented protective remedial measures, then Plaintiff's risk of contracting Valley Fever would have been significantly reduced.

114. The Defendants' deliberate indifference to those risks and failure to take action to prevent or reduce the risk caused Plaintiff's constitutional injuries.

115. Because Defendants, and each of them, failed to implement any reasonable preventive measures, the incarceration of Plaintiff was the equivalent of conducting a human medical experiment without Plaintiff's consent.

116. While a percentage of inmates might be expected to survive the disease, each of the Defendants knew that, for an unacceptable percentage of inmates, including Plaintiff, assignment to any of the San Joaquin Valley facilities was a potential death

1  sentence.

2      117.   Despite having knowledge about preventive measures, Defendants never

3  implemented these preventive measures at ASP and instead have engaged in a pattern

4  and practice that have placed and kept Plaintiff in situations of unreasonable risk of

5  substantial personal harm.

6      118.   At all times relevant, each of the Defendants knowingly and unreasonably

7  disregarded the objectively intolerable risk of harm to Plaintiff by failing to take

8  reasonable and recommended measures to abate the risk of contracting Valley Fever.

9  Defendants, and each of them, have shown deliberate and willful indifference to the

10 risk imposed upon Plaintiff, all in violation of his Eighth Amendment rights.

11     119.   As a direct, proximate and foreseeable result of the conduct of Defendants,

12 and each of them, Plaintiff has been damaged in an amount to be proven at trial and

13 which exceeds the jurisdictional limits of this Court.

14     120.   For the reasons stated herein, Plaintiff is entitled to punitive and/or

15 exemplary damages in an amount sufficient to punish Defendants.

16                          **PRAYER FOR RELIEF**

17     **WHEREFORE**, Plaintiff prays for judgment as follows:

18          (a)   compensatory damages in an amount to be proven at trial;

19          (b)   interest on any compensatory damages;

20          (c)   non-economic damages in an amount to be proven at trial for the

21 pain and suffering and misery associated with the experience of the disease and its

22 associated management, the loss of health and enjoyment of life attributable to

23 management of a serious disease, the fear, depression and demoralization associated

24 with the consequences of having a life-long disease, and the risk, and reality, of its

25 disseminated form resulting in severe health consequences up to and including an early

26 and painful death;

27          (d)   punitive and/or exemplary damages in an amount to be determined at

1  trial;

2          (e)    interest on any punitive and/or exemplary damages;

3          (f)    reasonable attorney's fees pursuant to 42 U.S.C. §§ 1988 and 1997(e)

4  at the maximum allowable rate by statute;

5          (g)    costs of suit, including the expense of experts; and

6          (h)    such other and further relief as this Court may deem just and proper.

7

8  DATED:  June 12, 2015          BOUCHER LLP

9

10                                By:  _____/s/ Raymond P. Boucher_____

11                                RAYMOND P. BOUCHER
                                  HERMEZ MORENO

12
                                  Attorneys for Plaintiff CHRISTOPHER
13                                PEARLMAN.

14

15

16                  **<u>DEMAND FOR JURY TRIAL</u>**

17      Plaintiff hereby demands jury trial to the full extent permitted by the law.

18

19  DATED:  June 12, 2015          BOUCHER LLP

20

21                                By:  _____/s/ Raymond P. Boucher_____

22                                RAYMOND P. BOUCHER
                                  HERMEZ MORENO

23
                                  Attorneys for Plaintiff CHRISTOPHER
24                                PEARLMAN.

25

26

27

00035183.4                        22
                    COMPLAINT FOR DAMAGES